# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **LOUVENIA ARMSTRONG,** | ) | |
| **HENRY BEASLEY,** | ) | |
| **BETTY TALLEY,** | ) | |
| **WALTER BROWN,** | ) | |
| **VINCENT BEAUREGARD,** | ) | |
| **LARSEN CASH,** | ) | |
| **and TIM SWADER,** | ) | |
| | ) | **Case No. 3:03-cv-01250** |
| **Plaintiffs,** | ) | **Judge Trauger** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WHIRLPOOL CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court are motions for summary judgment filed by the defendant, Whirlpool Corp., against the plaintiffs Louvenia Armstrong, Betty Talley, Tim Swader, Henry Beasley, and Larsen Cash (Docket Nos. 358, 362, 354, 350, and 366 respectively), to which those five plaintiffs have responded (Docket Nos. 390, 397, 407, 394, and 402 respectively), and the defendant has replied (Docket Nos. 413, 421, 419, 415, and 417 respectively). Also pending are motions for summary judgment filed by the defendant, Whirlpool Corp., against the plaintiffs Walter Brown and Vincent Beauregard (Docket Nos. 370 and 374, respectively), which have not

1

been opposed.  For the reasons discussed herein, the motions for summary judgment as to the claims asserted by all of the plaintiffs will be granted.[1]

## BACKGROUND

The plaintiffs are all African-Americans who are current or former employees of the defendant, Whirlpool Corp. ("Whirlpool"), and who work or worked at a Whirlpool facility in La Vergne, Tennessee (the "La Vergne Facility" or the "Facility").  The plaintiffs allege that they were subject to racial harassment, including the repeated use of racial slurs and epithets, racist graffiti, and verbal abuse.  The plaintiffs further allege that Whirlpool management was aware of this conduct, and either participated in it or tolerated it.  Two of the plaintiffs additionally allege that they were terminated in 2006 in retaliation for their participation in this litigation.  To the extent that the parties have made specific factual allegations with regard to each of his or her particular claims, those allegations will be discussed in detail *infra*.

## ANALYSIS

The plaintiffs brought this action alleging that they have been subject to a racially hostile work environment in violation of Title VII and § 1981.[2]  Additionally, two of the plaintiffs,

---

[1]The Third Amended Complaint (Docket No. 242) is the operative complaint.  The plaintiffs filed a Motion for Leave to File a Fourth Amended Complaint (Docket No. 328), to which the defendant has responded (Docket No. 332).  As summary judgment will be granted as to all of the plaintiffs' claims, the Motion for Leave to File a Fourth Amended Complaint will be denied as moot.

[2]Initially, this action was brought on behalf of the plaintiffs and a putative class of "current, former and future African-American Whirlpool employees."  (Docket No. 242.) However, the plaintiffs' motion to certify the class was denied (Docket No. 291), and the plaintiffs are now pursuing their claims as individuals.

2

Henry Beasley and Larsen Cash, assert retaliation claims against Whirlpool under § 1981. Whirlpool has moved to dismiss all of these claims.

## I.     Legal Background

A plaintiff may prove a claim of discrimination through either direct evidence of discrimination or circumstantial evidence that supports an inference of discrimination. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). Where the plaintiff's proof is based on circumstantial evidence of discrimination, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), is applied. Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 802. If the plaintiff carries that burden, the burden shifts to the defendant, who must present a legitimate, non-discriminatory reason for its actions. *Id.* at 802-03. If the defendant does so, the plaintiff must then show that the legitimate, non-discriminatory reason proffered by the defendant was in fact merely a pretext for discrimination. *Id.* at 804.

To establish a *prima facie* case of a racially hostile work environment under Title VII, a plaintiff must demonstrate that (1) he was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable.[3] *Hafford v. Seidner*, 183 F.3d 506,

---

[3] The plaintiffs' hostile work environment claims are brought under both Title VII and § 1981, and the retaliation claims asserted by plaintiffs Beasley and Cash are brought under § 1981. Claims of racial discrimination brought under Title VII and § 1981 are subject to the same analysis according to the same standards. *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004); *Johnson*, 215 F.3d at 573 n.5 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

3

512 (6th Cir. 1999). To establish a hostile work environment, a plaintiff must demonstrate that the workplace was "permeated with discriminatory intimidation, ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (citation and quotation omitted). Courts determining whether a hostile work environment exists must look to the totality of the circumstances, *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris*, 510 U.S. at 23), including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Morgan*, 536 U.S. at 116 (citation omitted). The test is both subjective and objective; the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787. Under the totality of the circumstances approach, a district court must "consider harassment by all perpetrators combined" and "[keep] in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes." *Williams v. Ford Motor Co.*, 187 F.3d 553, 562-63 (6th Cir. 1999) (quotation and citation omitted); *see also Jackson v. Quanex*, 191 F.3d 647, 659-60 (6th Cir. 1999).

In determining whether a hostile work environment exists, courts may consider evidence of harassment that was directed at others or that occurred outside the presence of the plaintiff. The Sixth Circuit has stated that "the factfinder may consider similar acts of harassment of which a plaintiff becomes aware during the course of his or her employment, even if the harassing acts were directed at others or occurred outside of the plaintiff's presence." *Hawkins v. Anheuser-*

4

*Busch, Inc.*, 517 F.3d 321, 336 (6th Cir. 2008). However, "[t]his is not to say that a plaintiff's knowledge of other acts of harassment will necessarily establish a hostile work environment, or that a factfinder is required to give significant weight to other acts that are unrelated to the plaintiff's allegations." *Id.* In assigning weight to acts of harassment that were directed at others or that occurred outside the plaintiff's presence, "the factfinder may consider factors such as the severity and prevalence of the similar acts of harassment, whether the similar acts have been clearly established or are mere conjecture, and the proximity in time of the similar acts to the harassment alleged by the plaintiff." *Id.*

In addition to the hostile work environment claims asserted by all of the plaintiffs, two plaintiffs have asserted retaliation claims under § 1981. To establish a claim of retaliation, a plaintiff must demonstrate that (1) he engaged in an activity protected by the statute; (2) the exercise of his protected rights was known by the defendant; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000); *Johnson*, 215 F.3d at 578.

## II.     Contested Motions for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an

5

essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'"  *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law.  *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).  To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial."  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).  If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted.  *Anderson*, 477 U.S. at 249-52.  "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

6

A.    *Louvenia Armstrong*

Louvenia Armstrong has been employed at the La Vergne Facility since 1984 and has worked as a tow motor driver for most of that time.  (Docket No. 242 ¶ 56.)

In support of her hostile work environment claim, Armstrong cites a number of incidents of which she was aware or that she witnessed personally.  The bulk of this conduct was perpetrated by a single Whirlpool employee, Dale Travis.[4]  Armstrong testified that she overheard Travis use racist slurs, specifically the N-word, and that she heard Travis say that people "should stay with their own kind," although she acknowledged that none of these words were directed at her.  (Docket No. 429 at 61-62, 127-28, 157.[5])  She also testified that she heard Travis make racist jokes, although she could not recall any specific offensive jokes that she overheard.  (*Id.* at 61-62, 127.)  She asserts that she complained about Travis's actions two or three times a week, but that nothing was ever done to remedy his behavior.  (*Id.* at 65.)  More specifically, she testified that she once complained about Travis's behavior to two supervisors, who then asked Travis to repeat his comments and laughed when he repeated his comments rather than doing anything about it.  (*Id.* at 61-62.)

In addition to her complaints regarding Travis's conduct, Armstrong claims that she overheard an employee tell jokes about African-Americans and Polish-Americans in the mid-1980s (*id.* at 147-48), that she had heard employees talking about the fact that a supervisor used the N-word to address an African-American employee, although she did not witness this herself

---

[4]Travis's conduct is a focus of the claims alleged by several of the plaintiffs.  Travis was terminated by Whirlpool in November 2003.  (Docket No. 361 Ex. 2 at 29.)

[5]Because isolated, disjointed excerpts of the plaintiffs' depositions were submitted by both the plaintiffs and the defendant, the court ordered that the full depositions be provided to the court.  (Docket No. 426.)  Those entire depositions have been considered in the rulings made herein.

7

(*id.* at 126-27), and that, at one point, a number of Caucasian co-workers wore pins bearing the image of the Confederate flag (*id.* at 89). Armstrong also testified that, several years ago, she overheard a Caucasian co-worker, whose name she did not recall, use the phrase "may the Klan be with you" and that this Caucasian co-worker "called black people lazy" and said that "he was going to tell his KKK buddies about — about us." (*Id.* at 158-59.) She also asserts that she was repeatedly referred to as "gal" by a Caucasian co-worker, a term that she considers to have racist undertones, although she never complained about her co-worker's use of this term to either him or to her superiors. (*Id.* at 154-55, 157.) She also alleges that she heard that a Caucasian supervisor threw out a cake baked by an African-American employee, although she only learned of this incident second-hand, and her deposition testimony does not reveal any support for her apparent belief that this incident was motivated by race. (*Id.* at 125-26.) Finally, with respect to racist graffiti at the plant, Armstrong acknowledged that she never personally observed any racist graffiti, although she did see pictures of the graffiti. (*Id.* at 115.)

Beyond these incidents about which she had personal knowledge, Armstrong points to a litany of other alleged incidents of racial harassment. (*See* Docket No. 390 at 3-7.) However, with respect to the vast majority of these incidents, Armstrong does not allege that she herself was witness to those incidents nor that she was aware of many of these incidents outside the context of this litigation. Although other acts of harassment may be considered in the context of evaluating a hostile work environment claim when a plaintiff becomes aware of them during the course of employment, without some evidence that Armstrong was aware of these incidents, they do not establish the existence of a hostile work environment. *Hawkins*, 517 F.3d at 336; *see also Jackson*, 191 F.3d at 661.

8

Considering Armstrong's evidence on the whole, her allegations do not establish a genuine issue of fact as to whether she was subject to conduct that was sufficiently severe and pervasive so as to establish the existence of a hostile work environment. First, she could only recall the barest specifics about the comments made by Travis, and she acknowledges that these comments were not directed at her. The other racist jokes she overheard are far removed in time from the majority of her allegations, in some cases occurring decades ago. Additionally, although the term "gal" might have certain racist undertones, it is also commonly used as a colloquial expression and, in this case, there is no indication that the term was used in a derogatory fashion. Armstrong's most compelling evidence of a hostile work environment was her co-worker's reference to the Ku Klux Klan and his comment that "he was going to tell his KKK buddies about — about us," statements that certainly are troubling. However, in light of the fact that these comments appear to have been isolated and not necessarily directed at Armstrong personally, they do not establish a genuine issue of fact as to harassment sufficiently severe as to alter the conditions of Armstrong's employment.

In addition to her allegations pertaining to the hostile work environment that she alleges to have experienced, Armstrong makes a number of allegations that she and other African-American employees were treated differently than Caucasian employees.[6] However, these

_____

[6]Armstrong asserts that, in the mid-1980s, she filed a grievance alleging that she was not provided adequate break time to change in and out of her uniform, unlike her co-workers, although she acknowledges that this situation was remedied after she complained about it. (*Id.* at 57-58.) She claims that she had more work to do than her Caucasian counterparts and that she was required to remain busy when Caucasian co-workers were permitted to idle (*id.* at 68-70, 133) and that she was subject to discipline when her Caucasian co-workers were not (*id.* at 86). Armstrong also claims that she applied for and was denied positions because of her race. Specifically, she applied for a supervisor position that she did not get (*id.* at 80), as well as for "lab jobs" that required her to operate a "brazer" (*id.* at 80-81). Although she asserts that a lab job position was given to a Caucasian woman who had never "brazed" before, Armstrong

9

allegations are based on Armstrong's own limited observations and there is scant evidence that these perceived slights were at all motivated by race.[7]  Moreover, these incidents do not constitute the type of discriminatory intimidation, ridicule or insult that gives rise to a hostile work environment claim, and Armstrong has not asserted any other claims.

Likewise, although Armstrong makes certain factual allegations that are in the nature of a retaliation claim,[8] there is no evidence beyond Armstrong's own speculation supporting the claim that this incident had anything to do with the current litigation and, once again, this incident neither supports her hostile work environment claim nor has she asserted a retaliation claim against the defendant.

As Armstrong has not established a genuine issue of fact as to the existence of a hostile work environment, summary judgment is appropriate with respect to her claims.

B.    *Betty Talley*

Betty Talley has been employed at the La Vergne Facility since approximately 1984 and has worked in a variety of positions during that time.  (Docket No. 242 ¶ 75.)

---

acknowledges that she was unable to recollect how to set up a brazer when asked to do so during her interview.  (*Id.* at 81-82.)  She also claims that she was denied certain jobs because of absenteeism, but she believes that her absentee record was inaccurate or falsified.  (*Id.* at 93-94.)  However, she provides no records or other evidence demonstrating that to be the case, relying simply on the fact that she does not recall being absent as frequently as Whirlpool's records reflect.  (*Id.* at 97-98.)

[7]For example, Armstrong believes that she was disciplined unfairly simply because she did not happen to observe Caucasian employees being disciplined.  (*Id.* at 86.)  Likewise, she was instructed not to chat with her co-workers and assumes that her Caucasian co-workers were not given similar instructions simply because "[t]hey kept doing it."  (*Id.* at 117.)

[8]Armstrong asserts that Ron Spivey, an African-American supervisor, did not assign overtime fairly and that this was because "They're upset about the case."  (*Id.* at 52-56.)

10

Talley testified to a number of incidents that she experienced personally or learned of at the time, most of which involved the conduct of Dale Travis. Talley testified that she heard Travis use the term "n***** lover" to describe co-workers who spoke with Talley (Docket No. 431 at 30, 93-94, 128), and that she heard Travis call an African-American co-worker "hey you black MF" (*id.* at 98). Talley also heard Travis call her co-plaintiff Henry Beasley an "uppity n*****" (*id.* at 143), and she learned second-hand that Travis had called Beasley a "yellow n*****" and a "redhead n*****" and said that Beasley "wanted to be white" (*id.* at 94-95, 128). Talley also learned, again second-hand, that Travis had called an African-American co-worker of Talley's a "black bitch." (*Id.* at 126, 141.) Talley further testified that she heard Travis use the term "pencil dick m*****f*****," although she did not know to whom this statement was directed, nor the race of the individual to whom it was directed. (*Id.* at 30-31, 36.) On Martin Luther King Day, Talley heard Travis say that "we needed a James Earl Ray day," and other employees informed her that they had heard Travis make this comment as well. (*Id.* at 31, 34.) She also observed Travis giving what he called "the Confederate flag sign" by raising his left fist over his head. (*Id.* at 123.) Talley further testified that she heard Travis say "may the Klan be with you" and that African-American employees should "stay with their own kind." (*Id.* at 144.) According to Talley, she complained to a supervisor about this conduct, and, after the supervisor talked to Travis, the supervisor and Travis "roll[ed] their eyes" at Talley, but Travis did not make any further such comments. (*Id.* at 31.) She also testified that she complained about Travis's behavior to the union president but was informed that, if she complained to management, "they'll just say it's shoptalk." (*Id.* at 134-35.) She speculates that Travis was not censured because "[h]e was white and [the supervisors] were afraid of him." (*Id.* at 39.) She also stated that she observed supervisors "laughing and talking" with Travis. (*Id.* at 39.)

11

Talley also registered complaints about the conduct of employees other than Travis. Most notably, she testified about certain racial comments made by Robert Quiggle, another Caucasian employee. According to Talley, he "talked about any race that wasn't white" and "told dirty jokes." (*Id.* at 128.) Specifically, Talley stated that Quiggle made comments about Laotians, Jews, and members of other ethnic groups. (*Id.* at 138, 147.) Although Talley complained about these comments, he continued to make racial remarks. (*Id.* at 135.) Moreover, Talley testified that three supervisors who overheard these jokes laughed and did not do anything in response. (*Id.* at 148.)

In addition to the comments made by Travis and Quiggle, Talley asserts that Bill Westberry, a supervisor, spoke to her rudely (*id.* at 85-86) and that she believes that Westberry was prejudiced based on the way he looked at her and treated her, although her testimony regarding this alleged prejudicial treatment was vague and nonspecific. (*Id.* at 87-88.) According to Talley, Westberry gave preference with respect to vacation time to employees with less seniority than Talley; however, she could not provide any more details as to who received such preferential treatment or when it occurred, except to say that "[i]t happens all the time." (*Id.* at 88.) Talley additionally testified that a Caucasian employee regularly referred to African-American employees as "ma," and that he does not refer to Caucasian employees as "ma."[9] (*Id.* at 125-26.) She also learned second-hand that someone in management had called a Caucasian co-worker a "n***** lover," although she did not know who had said that, nor did she hear it herself. (*Id.* at 141.) Talley also heard second-hand that Caucasian employees had talked about

---

[9]As with Armstrong's allegation about a Caucasian employee's use of the term "gal," it is unclear whether "ma" is a racial epithet, in this context or otherwise.

African-Americans being "lazy" and "looking for a free ride" and saying that "they need to be shipped back to Africa." (*Id.* at 129.)

In addition to the racist statements that Talley heard or learned about, Talley personally observed the presence of racist graffiti at the La Vergne facility three or four years ago. Specifically, she observed, in trailers that she unloaded, the words "KKK" and "n***** bitch," as well as sexually explicit drawings that had a racial component. (*Id.* at 116-18.) She testified that she complained to a supervisor about the graffiti whenever it appeared, and that the supervisor would then spray paint over the graffiti. (*Id.* at 117-18.) Finally, Talley, like Armstrong, relies on a laundry list of other alleged incidents of racial harassment at the La Vergne facility without providing any indication that she witnessed or learned of these incidents at the time. (*See* Docket No. 397 at 4-8.) To the extent that Talley herself did not experience certain of these incidents or know about them at the time, they do not contribute to the hostile working environment that Talley asserts she experienced.

The evidence that Talley relies on does not establish a genuine issue of fact as to the existence of a hostile work environment. She acknowledged that no racial slurs or racially offensive remarks were ever directed at her personally.[10] (*Id.* at 124.) And though she was aware of a handful of employees making racial remarks, to the extent that she did not witness some of these remarks but only learned of them second-hand, those remarks have a somewhat diminished significance in establishing the existence of a hostile work environment. Moreover, of the comments that she did hear, a number have no apparent racial connotation, such as

---

[10]Talley also testified that she never personally heard a Caucasian employee call an African-American employee by a racially offensive name (*id.* at 126-27), although this testimony seems to be at odds with her testimony about certain of Travis's statements.

13

Travis's "pencil dick m*****f*****" comment and the use of the word "ma,"[11] or else can hardly be considered to contribute to a severe and pervasively hostile environment, such as Westberry's alleged "rudeness." What remains is essentially a handful of uses of the n-word and its derivatives, primarily by Travis, some racist jokes by Quiggle, a few references by Travis to the Ku Klux Klan and James Earl Ray, and the presence of racist graffiti that was removed as soon as she reported it to a supervisor. Even when considered as a whole, this does not establish a genuine issue of fact as to the existence of a hostile work environment.

Additionally, Talley makes a number of assertions that African-American and Caucasian employees were treated differently.[12] However, as was the case with Armstrong's allegations, such incidents do not relate to Talley's hostile work environment claim, and she has not alleged a disparate treatment claim.

Summary judgment is therefore appropriate with respect to Talley's Title VII and § 1981 claims.

C. *Tim Swader*

---

[11]Indeed, some of the instances about which Talley testified during her deposition involved no racial language at all, but simply the use of "bad language," which, Talley acknowledged, was unrelated to race. (*See id.* at 100.)

[12]She claims that, on two occasions, she applied for jobs at the plant that were ultimately awarded to Caucasian employees, which she attributes to the fact that she is African-American. (*Id.* at 49.) She stated that, in one of these instances, she had seniority over the Caucasian employee who was given the job and that the Caucasian employee had never performed the job before. (*Id.* at 50.) She also stated that, when she received a form from Whirlpool rejecting her for the job, the form appeared to reflect, incorrectly, that she had not interviewed for this job, although she could not produce this form. (*Id.* at 50-51.) Talley also asserts that African-American employees were disciplined more harshly than were Caucasians, although the evidence she points to in support of this claim is fairly weak. In one case, she testified that an African-American employee was criticized by a supervisor for slowing down a production line when that employee was not responsible for slowing down the line. (*Id.* at 103-04.) After another co-worker acknowledged that he had accidentally stopped the line, the supervisor did not apologize for his criticism. (*Id.* at 104.)

14

Tim Swader has been employed at the La Vergne Facility for sixteen years and has worked in a variety of positions during that time. (Docket No. 242 ¶ 111.)

Swader testified that he repeatedly observed graffiti in the restrooms at the La Vergne Facility, including the words and phrases "KKK," "go home sand n*****s," "Jesus suffered so the n*****s must suffer too," and "white boys need to start fucking your bitches because those n*****s are." (Docket No. 432 at 71.) Although he complained about the graffiti, he testified that it remained in the restrooms for approximately a month and was only painted over after this lawsuit was initiated. (*Id.* at 70-71.) He has not seen any graffiti since that time. (*Id.* at 73.)

Swader also testified about a Caucasian co-worker, Willie, who "had a problem with me [and] didn't like me [because] [h]e said too many white girls like me." (*Id.* at 50.) This co-worker, who Swader testified had previously assaulted an African-American female employee (*id.* at 50), "told me he was going to kill me" (*id.* at 80). Swader also overheard Caucasian employees making a variety of racially derogatory comments. For example, he heard Caucasian employees comment that "they don't have no problem with black people, but they don't like to see black people mix with white people." (*Id.* at 78-79.) He also overheard a Caucasian employee state that "n*****s have it made" and that "white people are in the minority now" (*id.* at 80), and he heard another Caucasian employee refer to African-Americans as "lazy" (*id.* at 51). Additionally, a number of Swader's allegations, like those of his co-plaintiffs, related to the conduct of Dale Travis. Swader testified that Travis frequently wore "rebel flags" (*id.* at 52) and that he heard Travis comment that there should be a "James Earl Ray Day" (*id.* at 48). Swader also heard Travis sing the song "White Christmas" during the Christmas season and comment that it was "the best song he ever heard" (*id.* at 48), and he overheard Travis make a

comment that auto racing is "one sport that them n*****s aren't going to overcome or be better at." (*Id.* at 52.)

Swader's most serious allegations about Travis's conduct centered around Swader's relationship with a Caucasian co-worker, Tina Pope. Swader testified that Travis, who was friends with Pope's then-husband, objected to Swader's friendship with Pope because "he didn't like to see no black man talk to a white woman." (*Id.* at 45.) Swader testified that he received a tape recording from Pope that contained a message Travis left on Pope's then-husband's answering machine, stating

> Hey Kevin, this is Dale Travis. Did somebody say — about Tina and that n*****
> out here, somebody said they seen them at a grocery store this weekend and she
> told them that you all got a divorce.

(*Id.* at 114-16.) Although Swader was not in fact with Pope that weekend (*id.* at 116), he testified that he believed that Travis was referring to him because Travis objected to Swader's friendship with Pope (*id.* at 30, 117).[13] Swader complained about Travis's conduct to Kurt Gamauf, a human resources representative at Whirlpool. (*Id.* at 30.) Swader later learned that Gamauf had discussed this behavior with Travis, although Swader noted that Travis's behavior did not change. (*Id.* at 35-38.) Just a few days later, Travis called Swader a "sissy m*****f*****" and accused Swader of reporting him, comments that Swader believed were related to his race, and which Swader again reported to Gamauf. (*Id.* at 38-39.) On another occasion, Swader passed Travis in the hallway and Travis mouthed the word "motherfucker" at Swader and gave him an "intimidating" look, which Swader again reported. (*Id.* at 40-41.) Travis was terminated shortly after this third complaint. (*Id.* at 42-43.)

---

[13]Swader also testified that, although he was not having an affair with Pope at the time, they subsequently dated. (*Id.* at 117, 122.)

16

Swader's allegations establish a genuine issue of fact as to whether he was subject to severe and pervasive harassment establishing the existence of a hostile work environment. Two incidents in particular compel this conclusion, and both relate to Swader's relationship with Caucasian co-workers, and particularly, his female Caucasian co-workers. First, Swader's testimony establishes evidence as to not only the threat made by Willie against Swader's life, but also that Willie was motivated by a dislike of Swader that grew out of Swader's relationships — or Willie's perception of Swader's relationships — with Caucasian women. Swader's testimony also revealed that Willie had a history of violence, rendering his threat all the more real. In addition to Willie's threat, Swader's testimony demonstrates that Travis repeatedly harassed and intimidated Swader as a result of Swader's relationship with Pope. Unlike many of the incidents alleged by his co-plaintiffs, Swader was the direct recipient of these comments, and they were physically threatening, particularly in the case of Willie's comments. Combined with the graffiti that Swader testified to observing and the comments that he repeatedly observed, Swader has established a genuine issue of fact that he was subject to a hostile work environment.

The defendant next argues that Swader has not demonstrated that Whirlpool is liable for the hostile work environment to which he was subjected. Where an alleged harasser is a co-worker, an employer "can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."[14] *Blankenship*

---

[14]Swader asserts that the employer must demonstrate (1) that it exercised reasonable care to prevent and correct the harassing behavior and (2) that Swader unreasonably failed to take advantage of preventive or corrective opportunities to prevent harm. (Docket No. 407 at 27-28.) This formulation is derived, however, from cases addressing an employer's liability for harassment by a supervisor, rather than harassment by a co-worker. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998). Here, the harassers — Dale Travis and Willie — were co-workers, and thus the test set forth in *Blankenship* is the appropriate one. The Sixth Circuit has held that, even after the *Faragher* and

17

*v. Parke Care Ctrs.*, 123 F.3d 868, 873 (6th Cir. 1997). Here, there is no indication that Swader ever made a complaint about Willie's comments or the comments that he overheard. Swader did complain about Travis's comments, but he acknowledged that Gamauf spoke to Travis about his actions (*id.* at 38-39) and that Travis was subsequently terminated (*id.* at 42-43). Finally, with respect to the graffiti he observed, he testified that the graffiti was painted over a month after he complained about it, and that he has not observed any graffiti since that time.

Although Swader spends a great deal of his brief impugning Whirlpool's various reporting harassment policies and reporting and disciplinary procedures (*see* Docket No. 407 at 9-24), the fact is, that, to the extent Swader made any complaints at all with regard to Travis's conduct and the graffiti he observed, those issues were addressed by Whirlpool in a reasonably timely fashion. On the whole, Whirlpool's responses to Swader's complaints do not establish indifference or unreasonableness on Whirlpool's part, and thus it cannot be held liable for any harassment that Swader experienced.

Summary judgment is therefore appropriate with respect to Swader's hostile work environment claims.

D.     *Henry Beasley*

Henry Beasley was employed at the La Vergne Facility as a quality technician from approximately December 1984 until March 2006. (Docket No. 242 ¶ 65.)

Beasley testified to Dale Travis's cussing and offensive comments, stating that Travis "said something racially offensive any time, almost, he opened his mouth." (Docket No. 427 at

---

*Ellerth* decisions, "*Blankenship* remains good law for the proposition that a company may be held liable for coworker harassment if its 'response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Hawkins*, 517 F.3d at 338.

169.)  Specifically, Beasley testified that Travis once asked him if he thought there should be a "James Earl Ray Day" (*id.* at 160) and that Travis called African-American employees "white boys" (*id.* at 163-64).  Beasley also stated that Travis called African-Americans "n*****s" and used other derogatory words towards African-Americans.  (*Id.* at 123.)  Beasley testified that he complained about Travis's conduct to a supervisor in hopes that the supervisor would talk to Travis and explain "proper things to do and proper things not to do."  (*Id.* at 122-23.)  The supervisor reported that he did speak with Travis, and Beasley testified that, though Travis "settled down for a little while," he shortly went "right back to it."  (*Id.* at 124.)  Beasley stated that he did not complain again because it was "helpless . . . because of the way things were controlled inside Whirlpool."  (*Id.* at 126.)

In addition to the comments he heard Travis make, Beasley also heard a supervisor tell a joke that had certain racist "connotations" about a "n*****," although he could not remember the joke precisely.  (*Id.* at 171.)  Additionally, he testified that he overheard employees making derogatory comments and jokes about current events, including the Rodney King and O.J. Simpson cases.  (*Id.* at 158.)  Beasley also overheard co-workers in the bathrooms talking about an African-American man who was dragged behind a truck in Texas and saying that "he probably deserved it."  (*Id.* at 157.)  Additionally, a Caucasian co-worker said to Beasley that "blacks didn't like to work.  They liked to file lawsuit[s]."  (*Id.* at 170.)  Finally, Beasley testified to "certain racial tones" in "general conversation" around the La Vergne Facility, although he did not provide specific details.[15]  (*Id.*)

---

[15]Additionally, like his co-plaintiffs, Beasley cites a number of incidents that involved other co-workers at the La Vergne Facility, without providing any evidence that he even knew about these incidents at the time.  (Docket No. 394 at 2-6.)  Such incidents, for which he was not present and about which he was not aware, do not provide evidence that support his hostile work

With respect to graffiti at the La Vergne Facility, Beasley testified that he repeatedly observed racially offensive graffiti on bathroom walls. He did not provide many details about the content of the graffiti, however, although he took photographs of graffiti that included the letters "KKK." (*Id.* at 59-60.) He testified that all of the bathrooms in the Facility were "full of it." (*Id.* at 68.) In addition, Beasley testified that he was aware that an African-American co-worker found manure on a truck she used during her shift. (*Id.* at 73-74, 84-85.) Beasley also observed a spare truck bearing an image of a person with a rope around his or her neck, although he testified that this situation was "handled." (*Id.* at 92-94.) Beasley asserts that he complained to a manager about the graffiti in 2003 or 2004, but stated that it was not removed until July 2005. (*Id.* at 71, 94-95.) He additionally stated, with respect to the graffiti, that "[w]e complained to everybody from the front office on back," and were told "they would handle it" but that it "never was taken care of." (*Id.* at 96.)

Beasley additionally testified that those who complained were retaliated against (*Id.* at 145.) Beasley produced evidence that demonstrates that he complained in a 2002 email to two of his superiors at Whirlpool that he had observed a supervisor treating employees differently on the basis of their race, stating that the supervisor "yells & screams at some employees, and all that I seen him raise his voice too [*sic*] are not his color." (Docket No. 394 Ex. 11.) Beasley asserts that this email was not forwarded to human resources for several months and there is no evidence that Whirlpool ever conducted an investigation of Beasley's complaints. (Docket No. 394 at 7-8.)

---

environment claims.

With respect to Beasley's hostile work environment claims, he has not established a genuine issue of material fact as to the existence of severe and pervasive harassment constituting a racially hostile work environment. The specific statements and jokes to which he testified were relatively few and far between, and he did not testify that any incidents of racial slurs or threats were directed at him personally. Although he complained about Travis's conduct, he provided few specific examples. Additionally, although the graffiti to which he testified seemed to be an on-going problem, his testimony did not reveal any of the specific contents of the graffiti with the exception of a single instance of the letters "KKK." Moreover, Beasley's own testimony undermines his allegation that certain racial jokes to which he was exposed contributed to a hostile work environment; he testified that, when one co-worker told him jokes about O.J. Simpson, he did not find those jokes offensive as "it was just something that [his co-worker] clowned about." (Docket No. 427 at 190.) This constellation of incidents does not collectively rise to a level sufficient to establish severe and pervasive harassment altering the conditions of his employment so as to create a hostile work environment.

In addition to his hostile work environment claim, Beasley makes a number of allegations in support of his claim that he was terminated by Whirlpool in retaliation for his participation in this lawsuit. These allegations, and Beasley's termination, center around a notebook that was reported missing by a Whirlpool supervisor in October 2005, and about which Beasley testified at his February 2006 deposition. Specifically, Beasley testified that his co-plaintiff Larsen Cash found the notebook and gave it to him and that he provided the notebook to his attorney. (*Id.* at 234.) Beasley claimed that the notebook contained some notes relating to Beasley and that he believed the notebook demonstrated that Whirlpool "was monitoring us." (*Id.* at 233-34.) On March 10, 2006, shortly after his deposition, Beasley was terminated. (Docket No. 242 ¶ 72.)

21

Beasley has established a *prima facie* case because he engaged in protected activity known to the defendant by participating in this lawsuit and was terminated by the defendant shortly after appearing for a deposition in the course of that lawsuit.[16]  However, Whirlpool has asserted a non-discriminatory motivation for terminating Beasley — specifically, that Beasley was terminated because of his concealment and dishonesty with respect to the notebook, which only became known to Whirlpool at his deposition, rather than because of his participation in this litigation.  In support of its argument, Whirlpool relies on the existence of a company rule providing for "immediate termination for either dishonesty or hiding of a co-worker's property" as well as an arbitrator's decision[17] upholding Whirlpool's discharge of Beasley on the grounds that Beasley had stolen a co-worker's property and lied about it not only to management, but

---

[16]Although Whirlpool argues that there is no causal connection between Beasley's protected activity and his termination because the lawsuit was filed in 2003 and Beasley was not terminated until March 2006, the fact is that his termination was very closely linked in time to his deposition in February 2006.  Additionally, although Whirlpool claims that Beasley has not exhausted his administrative remedies with respect to his retaliation claim, the court notes that Beasley's claim was brought under § 1981, which is not subject to the exhaustion requirements of Title VII claims.  *See Young v. Sabbatine*, No. 99-6336, 2000 WL 1888672, at *3-4 (6th Cir. Dec. 19, 2000).

[17]Beasley has not contested the pertinence of the arbitrator's rulings to the matters currently before this court (Docket No. 394 at 26-30), nor does he provide any authority contrary to a Sixth Circuit case relied on by Whirlpool that provides that "the court may consider [an] arbitration decision as persuasive evidence that the grounds found by the arbitrator to be just cause for discharge . . . are sufficient to amount to just cause" and that "an arbitration decision in favor of the employer is sufficient to carry the employer's burden of articulating 'some legitimate, nondiscriminatory reason for the employee's rejection.'" *Becton v. Detroit Terminal of Consol. Freightways*, 687 F.2d 140, 142 (6th Cir. 1982).

22

also at his deposition and in the context of the arbitration hearing itself.[18]  (Docket No. 352 at 10.)

To demonstrate that Whirlpool's stated reason for Beasley's termination is merely a pretext for discrimination, Beasley must demonstrate that the proffered reason had no basis in fact, that it did not actually motivate Whirlpool's decision to terminate, or that it was insufficient to motivate the decision to terminate.  *See Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir. 1999); *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 883 (6th Cir. 1996).  The thrust of Beasley's pretext argument is that "common sense dictates that [Beasley's] actions did not warrant termination" (Docket No. 394 at 29), presumably an argument that his actions either were not the actual motivation for his termination or were insufficient to motivate the decision to terminate.  He does not contest, however, that there was a policy providing for termination for theft, nor that his actions constituted a violation of that policy.  Instead, he essentially argues that the scope of the penalty was not in keeping with the crime.

---

[18]According to Beasley's deposition testimony, the notebook contained "a chronology of what I was doing, where I was on the line.  Who I talked to.  How much time I was on the line and when I left his line where else I went.  What I done.  How long I spent there and basically how much time I was on the floor."  (Docket No. 427 at 235.)  However, pages from the notebook reveal that the notebook in fact contained notes regarding a number of Whirlpool employees, both Caucasian and African-American, in addition to a notation about Beasley. (Docket No. 353 Ex. 11.)

23

Beasley's argument does not withstand even the slightest scrutiny.[19]  There is no dispute that Whirlpool acted consistent with a rule in terminating Beasley once it discovered the facts surrounding Beasley's concealment of a notebook that did not belong to him.  The fact that the termination came so close on the heels of Whirlpool's learning about Beasley's possession of the notebook — and so long after this litigation commenced — lends further support to the conclusion that the notebook incident was, indeed, the motivation for Beasley's termination.  Moreover, it is worth noting that the arbitrator concluded that Beasley's termination was justified on the basis of his actions in concealing the notebook and lying about it.  (Docket No. 353 Ex. 19.)  As such, Beasley has not established that his termination was pretextual.

Therefore, summary judgment will be granted with respect to both Beasley's hostile work environment claims and his retaliation claim.

E.     *Larsen Cash*

Larsen Cash was employed at the La Vergne Facility from approximately November 1986 until March 2006, and worked in a variety of positions during that time.  (Docket No. 242 ¶ 102.)   Cash testified that, on two occasions, supervisors addressed him using the words "boy" and "big boy."  (Docket No. 428 at 129, 132.)  According to Cash, one of these supervisors "constantly" referred to African-American men as "boys."  (*Id.* at 129.)  On one occasion after a

---

[19]Beasley additionally argues that the contents of the notebook itself are reflective of a retaliatory intent.  (Docket No. 394 at 28-30.)  This argument is both tautological and unavailing. Essentially, Beasley argues that the notations in the book about him were quantifiably different from the notations regarding other employees and therefore reflect that the supervisor keeping the notebook was seeking a pretextual basis for firing Beasley.  (*Id.* at 28.)  Beasley's termination, however, was not premised on anything recorded in the notebook, but rather on Beasley's concealment and dishonesty with respect to the notebook.  The entries in the notebook are ultimately irrelevant to the question of whether Whirlpool's termination of Beasley as a result of the notebook incident was pretextual.

24

supervisor called him "boy," Cash asked him not to call him "boy," and neither supervisor addressed him as "boy" again. (*Id.* at 129, 132.) Cash also testified that he observed a Caucasian supervisor "rub up" against female employees and talk "nasty and dirty" to them. (*Id.* at 39-40.) Additionally, Cash heard second-hand that a Caucasian manager told an African-American supervisor that the manager was the supervisor's "n*****" (*id.* at 130), that a supervisor threw away a cake made by an African-American employee because he "said he didn't want no cake no n***** had made" (*id.* at 134), and that a group leader called an African-American employee a "sand head" or "rag head" (*id.* at 157-58). A co-worker also reported to Cash that a Caucasian employee had called an African-American employee a "lazy n*****" and that "all n*****s were lazy." (*Id.* at 305-06.) Finally, Cash testified that he complained to the union that a nurse told two female employees, one African-American and one Laotian, that they were stupid and dumb.[20] (*Id.* at 246.)

Cash, like his co-plaintiffs, also makes allegations focusing on the conduct of Dale Travis. Cash testified that Travis "was going around using the word 'n*****' all the time" and that he had complained about this language. (*Id.* at 80, 257.) At one point, Cash learned that Travis had said "white people had better watch out, there's a bunch of n*****s taking over." (*Id.* at 111.) Cash testified that, although an employee complained about Travis's comment, he did not believe that Travis was disciplined. (*Id.* at 111, 119-20.) Cash also heard Travis refer to an African-American employee as "white boy." (*Id.* at 253.)

---

[20]In support of his allegations of a hostile work environment, Cash also relies on a number of incidents that he neither witnessed personally nor knew about at the time. (Docket No. 402 at 3-7.) Such incidents do not provide evidence that Cash experienced a hostile work environment.

25

Additionally, Cash observed the presence of graffiti in restrooms at the La Vergne Facility. He testified that he observed the words and phrases "rag heads," "sand n*****" and "KKK," something to the effect of "wish all you n*****s would go back, we made a mistake bringing you over here," and the statement "I wish we could have a James Earl Ray Day so we could all get off for killing that n*****." (*Id.* at 222, 228, 236.) Cash also testified that he observed what appeared to be human feces on an African-American co-worker's tow motor, although he did not know who was responsible for that incident. (*Id.* at 254-55.)

Cash has not established a genuine issue of material fact as to his hostile work environment claim. As with his co-plaintiffs, the incidents that he points to in support of his claim do not constitute severe and pervasive harassment. Most of his allegations center around the graffiti he observed. Although he did testify that he observed graffiti regularly and recalled some of the specific racial epithets and phrases that he observed, none of the graffiti was directed at him and the few instances of spoken epithets that were directed at him — specifically, the use of the word "boy" by two supervisors — were isolated occurrences. Although the persuasive power of incidents that Cash learned of second-hand is somewhat limited, even taking those incidents into account, the totality of the circumstances do not establish an issue of fact as to the hostile work environment that Cash alleges he experienced.

In addition to his hostile work environment claim, Cash has asserted that he was terminated in retaliation for his involvement with this litigation. This claim, like that of his co-plaintiff Henry Beasley, relates to his possession of a supervisor's notebook, about which the defendants first learned during Beasley's deposition. *See* discusssion *supra* Section II.D. Cash testified that he found the notebook at the Facility, and decided to give the notebook to Beasley rather than returning it to the supervisor. (*Id.* at 171-73.) He stated that he did not give the

26

notebook back because it contained notes regarding himself and Beasley. (*Id.* at 172.) On March 9, 2006, shortly after his deposition, Cash was terminated. (Docket No. 242 ¶ 108.)

Cash, like Beasley, has established a *prima facie* case of retaliation, having demonstrated that his participation in this lawsuit constitutes engagement in a protected activity known to the defendant and that he was terminated shortly after his deposition. But again, as with Beasley, Whirlpool has proffered a non-discriminatory explanation for Cash's termination — specifically, that Cash was terminated because he concealed another employee's property and lied about it — and Cash has not carried his burden of demonstrating that this explanation was pretextual.

Whirlpool relies not only on a company rule providing for termination for dishonesty or hiding a co-worker's property, but also on an arbitrator's decision upholding the discharge for just cause and finding that Cash had stolen the notebook and lied about it repeatedly. (Docket No. 367 at 9.) Cash has not demonstrated that Whirlpool's stated reason had no basis in fact, that it did not motivate the decision, or that it was insufficient to motivate the decision. He does not contest the existence of the rule providing for termination in the event that an employee acts dishonestly or hides a co-worker's property nor that his conduct constituted a violation of that rule. As with Beasley, the fact that Cash's termination came shortly after Whirlpool learned about Cash's possession of the notebook and was upheld by the arbitrator lends further support for the conclusion that Cash has not demonstrated pretext.

Summary judgment will therefore be granted with respect to both Cash's hostile work environment claims and his retaliation claim.

III.    **Uncontested Motions for Summary Judgment**

In addition to the motions filed with respect to the claims asserted by Armstrong, Beasley, Talley, Cash, and Swader, the defendant has moved for summary judgment with respect

27

to the claims asserted by plaintiffs Brown and Beauregard, neither of whom opposed those motions. The court may not, however, grant the defendant's motions solely on the grounds that the plaintiffs failed to oppose those motions. *See Stough v. Mayville Cmty. Schs.*, 138 F.3d 612, 614 (6th Cir. 1998). As the Sixth Circuit has stated:

> [A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged [his initial] burden. . . . The federal rules require that the party filing a motion for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact.

*Id.* (citing *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991). The court, therefore, will consider whether the defendant has met its burden under the summary judgment standard.

A.    *Walter Brown*

Walter Brown was employed at the La Vergne Facility from approximately December 1994 until June 2002 in a variety of positions. (Docket No. 242 ¶ 84.)

During his deposition, Brown admitted that he was never the recipient of any racist comments or slurs, nor did he hear anyone tell any racial jokes while he worked at the La Vergne Facility. (Docket No. 430 at 56, 71, 74.) He testified, however, that he once heard a Caucasian supervisor refer to an African-American employee as a "black bitch" (*id.* at 52-53), and that he heard second-hand of another supervisor using racist language (*id.* at 56-57). Brown also testified to this supervisor's "abrasive and crass" behavior and another supervisor's "nasty . . . . tone" when he complained. (*See id.* at 48, 50.) Although Brown stated that he believed that this conduct was based on his race, he did not point to any specifics to support this conclusion and acknowledged that neither supervisor made any racial or derogatory comments. (*Id.* at 51-52.) Brown also testified that he heard two employees, one of whom was Caucasian and one of whom

28

was African-American, use the terms "black bastard" and "n*****" to refer to an African-American employee.  (*Id.* at 62-66.)  Brown testified that some of his Caucasian co-workers occasionally wore clothing bearing the image of the Confederate flag (*id.* at 81), that he witnessed "graphic illustrations" of racist jokes (*id.* at 74), and that he regularly observed racist graffiti in restrooms throughout the plant, although he acknowledged that the graffiti was removed on at least one occasion (*id.* at 82-84).

The defendant has carried its burden of demonstrating that there is no genuine issue of material fact as to the existence of a hostile work environment, as Brown's deposition testimony does not establish severe and pervasive racial harassment because he was never the target of any racial slurs or epithets and as the remainder of the incidents about which he complains were relatively isolated and not so threatening or humiliating as to interfere with his work performance.  As such, summary judgment is appropriate with respect to Brown's Title VII and § 1981 hostile work environment claims.  Moreover, although Brown testified at some length about his promotions and job assignments, and as the defendant's motion seeks summary judgment with respect to Brown's purported failure to promote claim in its motion, Brown has not raised such a claim and those arguments need not be addressed.

> ### B.     *Vincent Beauregard*

Vincent Beauregard was employed at the La Vergne Facility from approximately December 2001 until August 2002, when he was involuntarily laid off, returning to work in January 2003.  (Docket No. 242 ¶ 93.)

Beauregard testified that, on several occasions, he observed nooses fashioned from strings that were attached to products arriving at the La Vergne Facility.  (Docket No. 433 at 59-60.)  Beauregard stated that no one ever referred to him directly using a racial slur, but that he

29

heard people use such slurs in his presence.  (*Id.* at 61.)  Specifically, he testified that a

Caucasian co-worker repeatedly made comments referring to "blacks in the projects," and that

this same co-worker referred to an African-American's eyes as "shin[ing] like a coon in a tree."

(*Id.* at 64.)  Beauregard testified that he complained and that, afterward, the co-worker was "very

angry," but that the co-worker did not make any further racist comments.  (*Id.* at 65-66.)

Beauregard also testified that he heard several employees make remarks to the effect that "they

should send all the minorities out of the country" (*id.* at 137) and that a supervisor wrongly

accused him of breaking into the office, an incident that Beauregard attributed to his race (*id.* at

160).  Finally, Beauregard testified that he did not personally observe any racist graffiti at the

plant, but that he heard "rumors" about such graffiti.  (*Id.* at 61.)

The defendant has carried its burden of demonstrating that there is no genuine issue of

material fact as to the existence of a hostile work environment, as Beauregard's deposition

testimony does not establish severe and pervasive racial harassment because Beauregard, like

Brown, does not allege facts that amount to severe and pervasive harassment creating an abusive

working environment.  Summary judgment therefore is appropriate with respect to Beauregard's

hostile work environment claims.  Moreover, although a significant portion of both Beauregard's

deposition testimony and the defendant's motion for summary judgment related to job

assignments and Beauregard's absenteeism record, such incidents do not relate to the question of

a hostile work environment, and Beauregard has not alleged either a disparate treatment claim or

a retaliation claim.

## CONCLUSION

For the reasons discussed herein, the motions for summary judgment as to the claims

30

asserted by the plaintiffs Louvenia Armstrong, Betty Talley, Tim Swader, Henry Beasley, Larsen Cash, Walter Brown, and Vincent Beauregard will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge